**MILLENNIUM ENTERPRISES, INC., dba Music Millennium and Millennium Music, an Oregon corporation, Plaintiff,**

v.

**MILLENNIUM MUSIC, LP, a South Carolina limited partnership; Millennium Music, Inc., a South Carolina corporation, Defendants.**

No. 98–1058–AA.

United States District Court,
D. Oregon.

Jan. 4, 1999.

Darin D. Honn, James C. Loy, Christopher D. Bell, Duncan Honn, P.C., Portland, OR, for plaintiff.

Julianne Ross Davis, Robert K. Lau, Chernoff, Vilhauer, McClung & Stenzel, LLP, Portland, OR, for defendants.

## OPINION AND ORDER

AIKEN, District Judge.

Plaintiff files suit seeking damages and injunctive relief for alleged trademark infringement under the Lanham Act, 15 U.S.C. §§ 1051–1127. Plaintiff also alleges state statutory claims for unlawful trade practices, trademark infringement and dilution, and common law claims of unfair competition and trademark infringement. Defendants seek dismissal for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). For the reasons discussed below, defendants' motion is granted.

### I.  FACTUAL BACKGROUND

Plaintiff, Music Millennium, is a business incorporated in Oregon with its principal place of business located in Portland, Oregon. Plaintiff opened its first retail outlet under the name "Music Millennium" in 1969. Plaintiff now operates two retail music stores in Portland and also sells products through mail and telephone orders and its Internet Web site.

Defendant Millennium Music, Inc., is a South Carolina corporation and general partner of defendant Millennium Music, L.P., a South Carolina limited partnership. Defendants operate retail music stores in South Carolina under the name "Millennium Music." Defendants sell products through their retail outlets and their Internet Web site, although the vast majority of sales occur at their retail stores. From March 1998 through September 1998, defendants sold fif-

teen compact discs to nine separate customers in six states and one foreign country. The sales totaled approximately $225. During the same period, defendants' retail sales were $2,180,000. Defendants also offer franchising circulars through the Internet and have two franchised stores in North Carolina.

Defendants have purchased a small amount of compact discs from Allegro Corporation ("Allegro"), a distributor located in Portland, Oregon. Defendants' purchases from Allegro in 1994–1997 totaled approximately one-half of one percent of defendants' inventory purchases for those years.

On or about July 7, 1998, plaintiff received a credit document from Allegro. The credit was mailed to plaintiff in error; the document apparently was intended for defendants. *See* Affidavit of Donna Cleaver, Exhibit A.

On August 21, 1998, an Oregon resident, Linda Lufkin, purchased a compact disc from defendants through their Web site. During oral argument on defendants' motion to dismiss, the court learned from defendants that an attorney at the law firm for which Ms. Lufkin works requested that she purchase a compact disc from defendant. Apparently, the attorney is an acquaintance of plaintiff's counsel. Plaintiff did not dispute these facts. Defendants have sold no other merchandise to any Oregon resident.

Plaintiffs filed suit on August 28, 1998. According to plaintiff's complaint, defendants' use of the name "Millennium Music" in connection with the sale of goods in interstate commerce violates plaintiff's state and common law trademark rights. Plaintiff further alleges that consumers familiar with plaintiff will likely be confused as to the source or origin of defendants' goods, thereby causing plaintiff harm.

In September of 1998, defendants added a disclaimer to their Web site indicating that their products and franchise circulars were not available in Oregon.

## II. JURISDICTIONAL STANDARDS

Determining whether personal jurisdiction exists over an out-of-state defendant involves two inquiries: whether the forum state's long-arm statute permits the assertion of jurisdiction and whether assertion of personal jurisdiction violates federal due process. *Fireman's Fund Ins. Co. v. National Bank of Cooperatives*, 103 F.3d 888, 893 (9th Cir. 1996); *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1404–05 (9th Cir.1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1314, 131 L.Ed.2d 196 (1995). The relevant state statute applies even when the cause of action is purely federal. Fed.R.Civ.P. 4(k). Oregon's long-arm legislation is found in Rule 4 of the Oregon Rules of Civil Procedure. Plaintiff maintains that Rules 4C and 4D confer personal jurisdiction over defendants.[1] However, Oregon's catch-all jurisdictional rule confers personal jurisdiction coextensive with due process. Or. R. Civ. P. 4L. Thus, the analysis collapses into a single framework and the court proceeds under federal due process standards.

Due process requires that a defendant, if not present in the state, "have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks omitted). Minimum contacts can be demonstrated through facts supporting either general or specific jurisdiction over the defendant. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80

---

1. Rules 4C and 4D provide authorize personal jurisdiction as follows:

    4C   Local act or omission.

    In any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant.

    4D   Local injury; foreign act.

    In any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury, either:

    D(1) Solicitation or service activities were carried on within this state by or on behalf of the defendant; or

    D(2) Products, materials, or things distributed, processed, serviced, or manufactured by the defendant were used or consumed within this state in the ordinary course of trade.

L.Ed.2d 404 (1984). Plaintiff bears the burden of establishing personal jurisdiction through a prima facie showing of jurisdictional facts. *American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996); *Farmers Ins. Exchange v. Portage La Prairie Mut. Ins. Co.,* 907 F.2d 911, 912 (9th Cir.1990).

## A. General Jurisdiction

General jurisdiction refers to the authority of a court to hear any cause of action involving a defendant, regardless of whether the cause of action arose from the defendant's activities within the forum state. *Helicopteros,* 466 U.S. at 415, 104 S.Ct. 1868. In order for a court to assert general jurisdiction, the defendant must have "continuous and systematic" contacts with the forum state. *Id.* at 416, 104 S.Ct. 1868.

It is undisputed that defendants' business operations and retail outlets are located in South Carolina. Further, defendants have no physical presence within the state of Oregon. Defendants are not registered to conduct business in Oregon and have no registered agents, employees or sales representatives located in Oregon. No principles or personnel of defendants have ever traveled to Oregon. Defendants have never received a franchise inquiry from Oregon and have never offered a franchise to an Oregon resident or corporation. The only possible "contacts" defendant have had with Oregon include the sale of one compact disc to an Oregon resident, the purchase of inventory from an Oregon distributor and, according to plaintiff, the maintenance of an Internet Web site.

Plaintiff does not and cannot assert that any of these bases support general jurisdiction over defendants. Defendants' sale of one compact disc and sporadic purchases from a supplier are neither substantial nor "continuous and systematic" contacts with this forum. Further, the court is aware of no case in which a court asserted general jurisdiction based on the existence of an Internet Web site. In fact, a California district court declined to assert general jurisdiction on this ground. *McDonough v. Fallon McElligott, Inc.,* 40 U.S.P.Q.2d 1826, 1996

WL 753991 (S.D.Cal.1996). The court reasoned that "allowing computer interaction via the web to supply sufficient contracts to establish jurisdiction would eviscerate the personal jurisdiction requirement as it currently exists." 1996 WL 753991 at *3; *c.f. Mieczkowski v. Masco Corp.,* 997 F.Supp. 782, 785–86 (E.D.Tex.1998) (Internet Web site plus traditional business contacts with forum created basis for general jurisdiction). Thus, the sole issue is whether the court may assert specific jurisdiction over defendants.

## B. Specific Jurisdiction

Specific jurisdiction refers to a situation in which the cause of action arises directly from a defendant's contacts with the forum state. *See Sher v. Johnson,* 911 F.2d 1357, 1361 (1990). The Ninth Circuit employs a three-part test to determine whether the exercise of specific jurisdiction comports with due process. *Ballard v. Savage,* 65 F.3d 1495 (9th Cir.1995); *Roth v. Garcia Marquez,* 942 F.2d 617, 620 (9th Cir.1991). First, the defendant must perform some act or consummate some transaction within the forum by which it "purposefully avails" itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the forum and having "fair warning" that a particular activity may subject it to jurisdiction. *See Burger King v. Rudzewicz,* 471 U.S. 462, 472, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Second, the claim must be one which arises out of or results from the defendant's forum-related activities. Third, the court's exercise of jurisdiction must be reasonable. *Ballard,* 65 F.3d at 1498; *Roth,* 942 F.2d at 620–21.

Purposeful availment is shown "if the defendant has taken deliberate action within the forum state or if he has created continuing obligations to forum residents." *Ballard,* 65 F.3d at 1498. Although contacts that are "isolated" or "sporadic" may support specific jurisdiction if they create a "substantial connection" with the forum, the contacts must be more than random, fortuitous, or attenuated. *Burger King,* 471 U.S. at 472–73, 475, 105 S.Ct. 2174. Furthermore, it is not required that a defendant be physically present within the forum, provided its efforts are purpose-

fully directed toward forum residents. *Id.* at 476, 105 S.Ct. 2174. For example, jurisdiction may be properly asserted over a defendant who directs its tortious conduct toward the forum state, knowing the effects of the conduct will cause harm. *Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 79. L.Ed.2d 804 (1984). However, contacts resulting from the "unilateral activity of another party or third person" are not attributable to a defendant. *Burger King,* 471 U.S. at 475 & n. 17, 105 S.Ct. 2174. With these principles in mind, the court turns to the asserted conduct of defendants that plaintiff claims establishes minimum contacts with this forum.

### 1. Sale of Compact Disc

Plaintiff claims that defendants' sale of one compact disc to Ms. Lufkin constitutes purposeful availment of this forum, because the sale occurred after defendants "had solicited sales over the Internet in the state of Oregon." Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, p. 2. The court cannot agree.

During oral argument, plaintiff did not contest the fact that an acquaintance of plaintiff's counsel instructed Ms. Lufkin to purchase a compact disc from defendants. The court was gratified to learn that Ms. Lufkin, at least, was allowed to select the compact disc she was directed to purchase. Regardless, the court finds that the sale to Ms. Lufkin was nothing more than an attempt by plaintiff to manufacture a contact with this forum sufficient to establish personal jurisdiction.

■ Defendants cannot be said to have "purposely" availed themselves of the protections of this forum when it was an act of someone associated with plaintiff, rather than defendants' Web site advertising, that brought defendants' product into this forum. Moreover, plaintiff's claims of trademark infringement and unfair trade practices do not arise from the sale of the compact disc to Ms. Lufkin. "The gravamen of both an infringement and an unfair competition claims is whether the defendant has created a likelihood of confusion." *Shakey's, Inc. v. Covalt,* 704 F.2d 426, 430 (9th Cir.1983) (citing 15

U.S.C. § 1125(a) and Or.Rev.Stat. § 646.608(1)(b)). Plaintiff can hardly argue that such action "caused a likelihood of confusion" regarding plaintiff's and defendants' trade names; Ms. Lufkin knew exactly with whom she was dealing and knew that defendants were not associated in any way with plaintiff.

■ The court is dismayed by plaintiff's counsel's lack of candor. In submissions to this court, including the complaint, counsel repeatedly asserted that defendants' sale of goods in Oregon had caused plaintiff harm and "ascertainable loss." Complaint, ¶ 25. However, it is clear to the court that no confusion and no harm or loss resulted from one commercial sale orchestrated by plaintiff through an acquaintance of counsel. Such questionable and unprofessional tactics cannot subject defendants to jurisdiction in this forum. "Only those contacts with the forum that were created by the defendant, rather than those manufactured by the unilateral acts of the plaintiff, should be considered for due process purposes." *Edberg v. Neogen Corp.,* 17 F.Supp.2d 104, 112 (D.Conn.1998).

### 2. Purchases from Oregon Supplier

Likewise, defendants purchases from Allegro do not suffice to establish the requisite minimum contacts. It is well-established that sporadic purchases within a forum cannot support the assertion of personal jurisdiction unless the cause of action arises from or relates to those purchases. *Helicopteros,* 466 U.S. at 414, 418, 104 S.Ct. 1868. Plaintiff argues that its unlawful trade practices claim arises from the defendants' purchases, because confusion between plaintiff's and defendant trades' names resulted from defendants contacts with Allegro. *See* Or.Rev. Stat. § 646.608(1)(c). In support of this argument, plaintiff presents a credit document from Allegro that was intended for defendants but mailed to plaintiff.

Plaintiff's reliance on section § 646.608(1)(c) is misplaced. That statute defines an unlawful trade practice as including those which cause a "likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certifica-

tion by, another." Or.Rev.Stat. § 646.608(c)(1). As defendants argue, the primary purpose of the Oregon Unlawful Trade Practices Act, which includes § 646.608, is to protect consumers from misleading representations regarding the source of products, thus creating a "likelihood of confusion." *Shakey's,* 704 F.2d at 430.

A "[l]ikelihood of confusion exists when *consumers* are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Id.* (emphasis added); *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1048 (9th Cir.1998) (accord). For example, the Oregon Court of Appeals found a violation of § 646.608(1)(c) when a denturist made a misleading representation which could have led consumers to believe that the denturist was associated with a dentist. *Terry v. Holden–Dhein Enterprises,* 48 Or.App. 763, 767, 618 P.2d 7, 10 (1980). Under the facts presented to this court, the party allegedly confused by the parties' similar trade names is a supplier, not a consumer, of defendants' products.

Even if § 646.608(c) was intended to prohibit confusion among those other than consumers, § 646.608 does not confer a private cause of action. Or.Rev.Stat. § 646.638(1); *Terry,* 48 Or.App. at 768, 618 P.2d at 10. Rather, an individual action alleging a violation of 646.608(c) may only be brought if the plaintiff suffers an "ascertainable loss" as a result of the violation. *Id.* Here, plaintiff's assert no ascertainable loss caused by defendant's *purchase* of inventory from Allegro. In fact, plaintiff received a credit document, rather than an invoice, from Allegro. Accordingly, plaintiff's cause of action for unfair trade practices does not arise or relate to defendants' purchase of inventory from Allegro and cannot confer personal jurisdiction over defendants.

### 3. Effects of Defendants' Conduct

During oral argument, plaintiff argument that the effects of defendant's alleging in-

fringing activities cause harm in Oregon, plaintiff's principle place of business, thus subjecting defendants to this court's jurisdiction. In support for its invocation of the "effects test," plaintiff cites *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club,* 34 F.3d 410 (7th Cir.1994). The court is not persuaded.

In *Indianapolis Colts,* the Canadian Football League ("CFL") team in Baltimore attempted to call itself the "Baltimore CFL Colts." 34 F.3d at 411. As anyone familiar with football knows, the "Baltimore Colts" of the National Football League ("NFL") was "one of the most illustrious-teams in the history of professional football." *Id.* In 1984, the NFL· team's owner moved the franchise to Indianapolis but kept the name "Colts." This action infuriated the city and citizens of Baltimore. Nine years later, the CFL granted a franchise in Baltimore, and the selection of the team's name, "Baltimore CFL Colts," led the Indianapolis Colts to file a lawsuit alleging trademark infringement against the Baltimore franchise and the CFL. *Id.*

The Seventh Circuit asserted personal jurisdiction over the defendants, because the allegedly infringing trademark would cause harm in Indiana, the home of the Indianapolis Colts. *Id.* at 411–412. The court further found that defendant had "entered" the state through broadcasts of football games within the state. *Id.* at 412.

The facts of *Indianapolis Colts* are distinguishable from those before this court. Given the history between the two teams, it is reasonable to assume that the defendants were directing their infringing action at Indiana, specifically at the owner of the Indianapolis Colts, knowing that their actions likely would cause harm. And, presumably, television broadcasts of football games are aired in specific market areas. Unlike *Indianapolis Colts,* plaintiff here offers no evidence that defendants intentionally directed its activities at Oregon knowing that plaintiff would be harmed.[2]

---

2. Plaintiff urges the court to infer that defendants' knew of plaintiff's existence in Oregon for the purposes of this motion. Even assuming that

is true, plaintiff offers no evidence that defendants directed their conduct at this forum.

#### 4. Defendants' Internet Web Site

Plaintiff's remaining ground asserted in support of specific jurisdiction is defendants' Internet Web site through which persons can purchase compact discs, request franchising information and join a discount club. According to plaintiff, the fact that defendants maintain an interactive, rather than passive, Web site is a sufficient contact with this forum to establish personal jurisdiction. In other words, plaintiff argues that purposeful availment is satisfied by an Internet Web site which allows for the exchange of information between the Web user and the Web site, regardless of whether an *actual* exchange of information occurred with residents of this forum.

The facts of this case coupled with plaintiff's argument raise questions that have yet to be answered in this Circuit. Because the answers to these questions will have far-reaching implications for those who utilize the Internet for commercial purposes, the court takes a comprehensive look at the current state of the law with respect to personal jurisdiction and Internet contacts.

### III. THE INTERNET AND PERSONAL JURISDICTION

#### A. The Internet and the World Wide Web

The Internet is a "giant network which interconnects innumerable smaller groups of linked computer networks." *American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 830 (E.D.Pa.1996), *aff'd* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("*ACLU v. Reno*"). Some networks are "closed" to other networks, but many are connected to other computer networks so that each computer in every network can communicate with computers on any other network in the system. *Id.* at 831. "This global Web of linked networks and computers is referred to as the Internet." *Id.*

Computers and networks that comprise the system are owned by governmental and public institutions, non-profit organizations and private parties. *Id.* "The resulting whole is a decentralized, global medium of communications—or 'cyberspace'—that links

people, institutions, corporations, and governments around the world." *Id.*

The two most common methods to connect with the Internet are the use of a computer or terminal that is directly connected to a computer network, which, in turn, is connected to the Internet, or the use of a personal computer with a modem to connect through telephone lines to a network that is connected to the Internet. *ACLU v. Reno*, 929 F.Supp. at 832. Students, faculty, and researchers can access the Internet through educational institutions. *Id.* Likewise, many corporations and other employers link their office networks to the Internet, thus providing their employees with direct or modem access to the Internet. *Id.* at 832–33. Those who lack access to the Internet through schools or employers often can gain access through libraries, community networks, "computer coffee shops" or commercial online service providers. *Id.* at 833.

The size of the Internet is difficult to estimate with accuracy at any given moment. *ACLU v. Reno*, 929 F.Supp. at 831. "It is indisputable, however, that the Internet has experienced extraordinary growth in recent years." *Id.* In 1989, approximately 90,000 computer were connected to the Internet; in 1996, over 9,400,000 computers worldwide were estimated to be connected. *Id.* These numbers do not include personal computers used to access the Internet using modems. *Id.* By 1999, the number of Internet users is expected to grow to 200 million. *Id.*

The World Wide Web ("The Web") is the most well-known and advanced method of locating and retrieving information on the Internet. *ACLU v. Reno*, 929 F.Supp. at 835–36. The Web utilizes a specific formatting language so that programs which search the Web can display documents containing text, image, sound and video. *Id.* at 836. Any Web document can include links, known as "hyperlinks," to other types of information or resources, which can be used by clicking the computer mouse on the hyperlink which immediately connects the user to the other resource. *Id.* "Such 'hyperlinks' allow information to be accessed and organized in very flexible ways, and allow people to locate and efficiently view related information even if

the information is stored on numerous computers all around the world." *Id.*

Many organizations and businesses now have "home pages" or "sites" on the Web. *ACLU v. Reno*, 929 F.Supp. at 836. "These are documents which provide a set of links designed to represent the organization, and through links from the home page, guide the user directly or indirectly to information about or relevant to that organization." *Id.* When an organization wants information made available, it is "published" on the Web. *Id.* at 837.

The Web contains information from a variety of sources and is accessible to Internet users around the world. *Id.* at 835–36. "Anyone with a personal computer, a telephone modem, and appropriate computer software may gain access to the Internet." *Heroes, Inc. v. Heroes Foundation*, 958 F.Supp. 1, 4 (D.D.C.1996). Once connected to the Internet, the user may view Web pages "which provide information about almost anything one can imagine." *Id.* Likewise, the Internet "enables anyone with the right equipment and knowledge ... to operate an international business cheaply, and from a desktop." *CompuServe v. Patterson*, 89 F.3d 1257, 1262 (6th Cir.1996).

While the Internet allows businesses to engage in international communication and commerce, those businesses—whether they be one-person operations or multi-national corporations—remain "entitled to the protection of the Due Process Clause, which mandates that potential defendants be able 'to structure their primary conduct with some minimum assurance as to where the conduct will and will not render them liable to suit.' " *Id., quoting World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). As the Second Circuit has recognized, however, "attempting to apply established trademark law in the fast-developing world of the Internet is somewhat like trying to board a moving bus ...." *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997). The court finds the same is true when attempting to apply traditional notions of personal jurisdiction.

Unlike newspaper, mailing, radio, television and other media containing advertisements and solicitations, most Internet advertisements and solicitations are not directed at a specific geographic areas or markets; to the contrary, advertising on the Internet targets no one in particular and everyone in particular in any given geographic location. At first glance, the question of personal jurisdiction in such scenarios seems an all or nothing proposition. Nevertheless, district courts—and to a lesser extent, circuit courts—have attempted to develop guidelines in this novel area of the law, although "the development of the law concerning the permissible scope of personal jurisdiction is in its infant stages." *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1123 (W.D.Penn.1997).

## B. Cases Interpreting Internet Contacts

One of the first cases to address the question of personal jurisdiction and the Internet was *Inset Systems, Inc. v. Instruction Set, Inc.*, 937 F.Supp. 161 (D.Conn.1996). In that case, the plaintiff alleged trademark infringement as a result of the defendant's alleged use of plaintiff's trademark as its Internet domain address. 937 F.Supp. at 163. The defendant did not have employees or offices or conduct business regularly within the forum state. *Id.* at 162–63. Rather, the plaintiff claimed that the defendant's Internet Web site, which contained advertising and a toll-free telephone number, constituted sufficient minimum contacts for purposes of federal due process. *Id.* at 164–65.

In discussing the defendant's Web site, the court remarked:

> In the present case, [defendant] has directed its advertising activities via the Internet and its toll-free number toward not only the state of Connecticut, but to all states. The Internet as well as toll-free numbers are designed to communicate with people and their business in every state. Advertisements on the Internet can reach as many as 10,000 Internet users within Connecticut. Further, once posted on the Internet, unlike radio and television advertising, the advertisement is available continuously to any Internet user.

*Id.* at 165. Although these findings tend to show that the defendant did not target its Web site at the forum state in any particular manner, the court concluded that, through its Web site, defendant had "purposefully availed itself of the privilege of doing business within Connecticut." *Id.*

From this rather inauspicious beginning, the trend has shifted away from finding jurisdiction based solely on the existence of Web site advertising. Instead, "something more" is required to show that the defendant purposefully directed its activities at the forum. *See Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir.1997).[3] After *Inset*, two district courts endeavored to set standards the majority of courts now have adopted.

In *Bensusan Restaurant Corp. v. King*, 937 F.Supp. 295 (S.D.N.Y.1996), *aff'd* 126 F.3d 25 (2d Cir.1997), the operator of a New York jazz club, Bensusan, brought suit against the owner of a small Missouri jazz establishment, King, claiming that King infringed on Bensusan's right to the trademark "The Blue Note." Bensusan alleged that jurisdiction over King was properly asserted in New York, because King maintained a Web site that was accessible to New York residents. *Id.* at 299. The court disagreed: "The mere fact that a person can gain information on the allegedly infringing product is not the equivalent of a person advertising, promoting, selling or otherwise making an effort to target its product in New York." *Id.*

The court further found that assertion of jurisdiction over King would violate the Due Process Clause, reasoning that King had not purposefully availed himself of the benefits of New York when he "simply created a Web site and permitted anyone who could find it to access it." *Id.* at 301. "Creating a site, like placing a product into the stream of commerce, may be felt nationwide—or even worldwide—but without more, it is not an act purposefully directed toward the forum state." *Id.* Finally, the court found Bensusan's argument "that King should have foreseen that users could access the site in New York and be confused as to the relationship of the two Blue Note clubs" did not satisfy the requirements of due process. *Id.*

In *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1123 (W.D.Pa. 1997) ("Zippo"), the plaintiff alleged trademark dilution and infringement based on the defendant's Web site domain names. 952 F.Supp. at 1121. In determining whether jurisdiction was proper, the court applied a "sliding scale" under which "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* at 1124.

At one end of the scale are circumstances where a defendant "conducts business" over the Internet with residents of the forum, allowing for the assertion of personal jurisdiction in most cases. *Zippo*, 952 F.Supp. at 1124. In such situations, the assertion of jurisdiction is almost always proper. At the opposite end are situations where a defendant simply posts information on a Web site which is accessible to users in the forum state as well as others. "A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jur-

---

**3.** The "something more" identified in *Cybersell* apparently is a reference to the plurality opinion in *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), where the Supreme Court split over the requirements for application of the stream of commerce theory. In an opinion written by Justice O'Connor, four justices endorsed the view that the "placement of a product in the stream of commerce, *without more*, is not an act the defendant purposefully directed toward the forum State." *Id.* at 112, 107 S.Ct. 1026 (emphasis added).

The Ninth Circuit tentatively has adopted the plurality opinion in *Asahi*, noting that "[a]t least a majority and perhaps all the justices agreed in *Asahi* that jurisdiction cannot be founded on the mere presence of a product in the forum ...." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 271 (9th Cir.1995).

Many cases find the "stream of commerce" theory of specific jurisdiction analogous to Website advertising, in that the person or business operating the site creates it for use and viewing on the Internet with the hope, if not the expectation, that users will access the site and learn about the company's products or services. *See Smith v. Hobby Lobby Stores, Inc.*, 968 F.Supp. 1356, 1362–65 (W.D.Ark.1997); *Bensusan Restaurant Corp. v. King*, 937 F.Supp. 295, 301 (S.D.N.Y.1996).

isdiction." *Id.* In the middle are situations where a defendant operates an interactive Web site, allowing a user to exchange information with the host computer. In such a case, a court must review the "level of interactivity and commercial nature of the exchange of information" to determine whether jurisdiction should be exercised. *Id.*

Most courts follow the reasoning set forth in *Bensusan* and *Zippo* and decline to assert jurisdiction based solely on Web site advertising. *See e.g., Patriot Systems, Inc. v. C–Cubed Corp.,* 21 F.Supp.2d 1318 (D.Utah 1998); *SF Hotel Company v. Energy Investments,* 985 F.Supp. 1032 (D.Kan.1997); *Weber v. Jolly Hotels,* 977 F.Supp. 327, 333 (D.N.J.1997); *Smith v. Hobby Lobby Stores, Inc.,* 968 F.Supp. 1356 (W.D.Ark.1997); *IDS Life Ins. Co. v. SunAmerica, Inc.,* 958 F.Supp. 1258, 1268 (N.D.Ill.1997), *vacated in part on other grounds,* 136 F.3d 537 (7th Cir.1998); *No Mayo–San Francisco v. Memminger,* 1998 WL 544974 (N.D.Cal.1998) *CFOs 2 Go, Inc. v. CFO 2 Go, Inc.,* 1998 WL 320821 (N.D.Cal.1998); *Transcraft Corp. v. Doonan Trailer Corp.,* 45 U.S.P.Q.2d 1097, 1997 WL 733905 (N.D.Ill.1997); *Graphic Controls Corp. v. Utah Medical Products,* 1997 WL 276232 (W.D.N.Y.1997), *aff'd* 149 F.3d 1382 (Fed.Cir.1998); *Hearst Corp. v. Goldberger,* 1997 WL 97097 (S.D.N.Y.1997).

Those courts which have asserted jurisdiction in cases involving passive Web sites did so because the defendant had additional contacts with the forum which related to the plaintiff's claim. *See Gary Scott International, Inc. v. Baroudi,* 981 F.Supp. 714 (D.Mass.1997) (jurisdiction based on sales of infringing products to Massachusetts retailer in addition to Web site advertising); *Heroes, Inc. v. Heroes Foundation,* 958 F.Supp. 1, 3–5 (D.D.C.1996) (jurisdiction based on Web site and advertisement in local newspaper soliciting donations).

Likewise, courts generally have exercised jurisdiction in cases at the other end of the scale, where the defendant "conducted business" over the Internet by engaging in repeated or ongoing business transactions with forum residents or by entering into a contract with the plaintiff through the Internet. *See CompuServe v. Patterson,* 89 F.3d 1257 (6th Cir.1996); *Thompson v. Handa–Lopez, Inc.,* 998 F.Supp. 738 (W.D.Tex.1998) (defendant operated casino-type arcade game through its Web site and entered into contract with plaintiff to play the game); *Zippo,* 952 F.Supp. at 1125–26 (defendant contracted with approximately 3,000 individuals and several Internet access providers in the forum·state).

Further, courts have found purposeful availment when the claim involves an intentional tort allegedly committed over the Internet, such that the defendant intentionally directed its tortious activities at the forum state. *See Panavision v. Toeppen,* 141 F.3d 1316 (9th Cir.1998) (tortious infringement of trademark where the defendant knew actions would cause plaintiff harm in forum state); *Blumenthal v. Drudge,* 992 F.Supp. 44 (D.D.C.1998) (defamatory statements on Internet site);ˈ *Telco Communications v. An Apple A Day,* 977 F.Supp. 404 (E.D.Va.1997) (defamatory press releases on passive Web site); *EDIAS Software v. BASIS International,* 947 F.Supp. 413 (D.Ariz.1996) (defamatory messages directed at forum). These cases are based on the "effects test" articulated in *Calder v. Jones,* 465 U.S. 783, 788–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), where the Supreme Court found personal jurisdiction properly asserted over a defendant whose libelous actions were directed at the plaintiff resident of the forum state. *See also Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1195–97 (9th Cir.1988) (defendant fabricated elaborate story linking plaintiff's name with services).

Courts have reached differing conclusions with respect to those cases falling into the middle "interactive" category identified in *Zippo.* As declared by one commentator, the "current hodgepodge of case law is inconsistent, irrational, and irreconcilable." Howard B. Stravitz, *Personal Jurisdiction in Cyberspace: Something More is Required on the Electronic Stream of Commerce,* 49 S.C. L.Rev. 925, 939 (1998). In these cases, some courts find that an interactive Web site alone is sufficient to establish minimum contacts. Others find minimum contacts through additional non-Internet activity in the forum, regardless of whether the activity is related to

the underlying claim. Finally, some courts require additional conduct in the forum that is related to the plaintiff's cause of action.

### 1. Interactive Web Site

#### a. Personal Jurisdiction Asserted

A case oft-cited for the proposition that interactive Web sites constitute minimum contacts is *Maritz, Inc. v. Cybergold, Inc.*, 947 F.Supp. 1328 (E.D.Mo.1996). In that case, the defendant maintained a Web site that invited users to a join mailing list in order to receive information about defendant's service. 947 F.Supp. at 1330. The court rejected the defendant's characterization of the Web site as "passive," noting that users could join the mailing list and receive information through the Web site. *Id.* at 1333. Indeed, the court rested jurisdiction on the fact that the defendant "consciously decided to transmit advertising information to all Internet users, knowing that such information will be transmitted globally." *Id.* at 1333. The court did not examine whether any resident of the forum actually had signed the mailing list or received information from the defendant as a result; rather, the court found that defendants' mailing list will "presumably includ[e] many residents of Missouri" and noted that forum residents had accessed the site 131 times. *Id.* at 1330. *See also Superguide Corp. v. Kegan*, 987 F.Supp. 481 (W.D.N.C.1997) (the court "assumed" residents of forum had accessed defendant's Web site and utilized defendant's commercial services).

In *GTE New Media Services Inc. v. Ameritech Corp.*, 21 F.Supp.2d 27 (D.D.C.1998), the court asserted jurisdiction over companies providing national "Yellow Pages" directory services over the Internet. The plaintiff alleged that the defendants formed agreements with Web browsers "to prevent users from accessing their competitors' websites through essential Internet access points." 21 F.Supp.2d at 37. The court found the Web

sites highly interactive and the quality and nature significant so as to allow the assertion of personal jurisdiction. *Id.* at 38–39. The court also emphasized that the defendants derived substantial advertising revenues from the directory sites when residents of the forum accessed and utilized the defendants' Internet Yellow Pages. *Id.*[4]

Finally, in *Vitullo v. Velocity Powerboats, Inc.*, 1998 WL 246152 (N.D.Ill.1998), the court found that the defendant's Internet Web site provided the contact necessary to assert specific jurisdiction under a stream of commerce theory in a products liability action. Defendants' Web site solicited residents to attend their "local boat show" and view defendants' boats and provided a hyperlink with information about a boat show within the forum state. *Id.* at *6. The court found that the Web site thus targeted local residents: "It is logical to say that a 'national advertisement' available to all persons with access to the Internet may take on a 'local' characteristic when it expressly solicits local residents, as does the Velocity web page." *Id.* at *7.

#### b. Personal Jurisdiction Declined

The following courts declined to assert personal jurisdiction over the defendant based solely on the defendant's interactive web site.

In *Edberg v. Neogen*, 17 F.Supp.2d 104 (D.Conn.1998), the defendant's Web site allowed users to order product information and send electronic mail to defendant's representatives. The court found that no evidence suggested that any user in the forum state accessed the defendant's Web site or purchased products based on the Web site. Further, nothing suggested that the defendant directed its Web site at residents of the forum "anymore than anyplace else in the nation." *Id.* at 113–14.

A similar result occurred in *E–Data Corp. v. Micropatent Corp.*, 989 F.Supp. 173

---

4. It is unclear whether the court exercised specific or general jurisdiction over the defendants. The court found that "the continuous contact the defendants' interactive website have with the [forum] demonstrate the defendants purposefully established minimum contacts by invoking the benefits and privileges of conducting activities in the forum district." 21 F.Supp.2d at 39. Thus, it appears that the court found "purposeful availment" to establish specific jurisdiction through "continuous" activity, normally a basis for general jurisdiction.

(D.Conn.1997). In that case, the defendant operated a Web site where users could purchase, license, and download photography images. The defendant claimed it had no knowledge of the geographic location of any given customer. In response, the plaintiff failed to offer any evidence that defendant's advertising ever reached Connecticut, "i.e., that any Connecticut resident ever accessed" defendant's Web site. *Id.* 176 n. 2. Rather, plaintiff simply showed the potential for the defendant to reach and solicit forum residents by its "offer to sell" photography images. The court rejected plaintiff's argument: "If such potentialities along were sufficient to confer personal jurisdiction over a foreign defendant, any foreign corporation with the potential to reach to do business with Connecticut consumers by telephone, television or mail would be subject to suit in Connecticut." *Id.* at 177.

In *Scherr v. Abrahams*, 1998 WL 299678 (N.D.Ill.1998), the court found that defendant's Web site was interactive because it allowed the user to type in an e-mail address and receive a copy of a publication in return. *Id.* *5. In contrast with *Maritz*, the court declined to assert jurisdiction, because the level of interactivity was low and the site was not targeted specifically at forum residents. *Id.*

Finally, in *CD Solutions v. Tooker*, 965 F.Supp. 17 (N.D.Tex.1997), the court declined to assert specific jurisdiction on the grounds that the plaintiff's claims did not relate to the defendants' contacts with Texas. *Id.* at 20. The plaintiff sued the defendant over defendants' use of the domain name "cds.com" for their Web page on the Internet. *Id.* at 19. Both plaintiff and defendants advertised and sold their services over the Internet. *Id.* Nonetheless, the court found no connection between the defendants' asserted commercial efforts and the core question underlying the action, which was whether defendants' had infringed upon copyrights owned by the plaintiff. *Id.* at 20.

### 2. Interactive Web Site Plus Non–Internet Contacts

In *Hasbro, Inc. v. Clue Computing, Inc.*, 994 F.Supp. 34 (D.Mass.1997), the plaintiff sued the defendant, a small computer consulting company, for trademark infringement in connection with the defendant's use of the domain name "clue.com" for its Internet Web site. Initially, the court reasoned that "imposing traditional concepts on commercial Internet users might have dramatic implications, subjecting them to nationwide or even international jurisdiction." *Id.* at 39. Nevertheless, the court asserted specific jurisdiction over defendant based, in part, on defendant's Web site, which allowed users to send e-mail to the company, explaining, "Clue Computing's Web site is interactive, encouraging and enabling anyone who wishes, including Massachusetts residents, to send e-mail to the company." *Id.* at 45.

The court also deemed jurisdiction proper based on defendant's non-Internet activities, including services performed for a Massachusetts company. *Id.* In doing so, the court apparently took a "totality of the contacts" approach and considered contacts unrelated to plaintiff's claim. Although defendant's Web-related activities were related to the trademark action—indeed, were the nexus of the litigation—defendant's computer consulting work with a Massachusetts company was completely unrelated to the trademark action.

A different analysis was presented in *Mieczkowski v. Masco Corp.*, 997 F.Supp. 782 (E.D.Tex.1998), where the court found defendant's minimal sales in the forum through traditional methods, along with its interactive Web site, constituted continuous and systematic contacts with the forum to support the assertion of general jurisdiction in a products liability case. *Id.* at 787. The court explicitly declined to decide "whether standing alone the Web site maintained by the defendant is sufficient to satisfy a finding of general jurisdiction." *Id.* at 788. *But see Fernandez v. McDaniel Controls, Inc.*, 999 F.Supp. 1365, 1368 (D.Hawai'i 1998) (refusing to assert specific jurisdiction in products liability cased based on defendant's passive Web site and shipments of product to forum at request of distributor).

### 3. Interactive Web Site Plus Related Contacts

In *Park Inns International v. Pacific Plaza Hotels, Inc.*, the defendants operated an

interactive Web site and accepted hotel reservations from residents of the forum through the Web site. 5 F.Supp.2d 762, 764–65 (D.Ariz.1998). Reviewing a recent Ninth Circuit decision, the court found that purposeful availment is shown if the defendant transacted business with forum residents over the Internet. *Id.* at 763 (citing *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414 (9th Cir.1997)). Thus, the court exercised specific jurisdiction over the defendants.

Similarly, in *American Network, Inc. v. Access America/Connect Atlanta, Inc.,* 975 F.Supp. 494 (S.D.N.Y.1997), the court found purposeful availment because the defendant sold subscriptions for Internet services to residents of the forum state and entered into contracts with those residents through its Web site. *Id.* at 499. In so ruling, the court questioned whether the mere existence of an interactive Web site may suffice for personal jurisdiction, reasoning that "arguably a defendant should not be subject to jurisdiction in New York simply because its home page could be viewed by users there." *Id.* at 498–99. Instead, the court relied on the fact that the defendant had entered into contracts with residents of New York that were related to plaintiff's cause of action for trademark infringement. *Id.*

In yet another case, the court asserted jurisdiction over a defendant accused of breaching a trademark licensing agreement with the plaintiff. *Digital Equipment Corp. v. AltaVista Technology, Inc.,* 960 F.Supp. 456 (D.Mass.1997). The plaintiff claimed that the defendant's Web site breached the licensing agreement between the parties, which governed the defendant's use of plaintiff's trademark on its Internet Web site. *Id.* at 459–61. Accordingly, the court found that the defendant had purposely availed itself of the benefits of the forum by entering into an agreement with the resident of the forum. *Id.* at 468–69. The court further noted that the defendant sold products to Massachusetts residents on at least three occasions through its Web site. *Id.* at 464. Finally, the defendant's alleged infringement was found analogous to intentional tortious conduct in that it was "purposefully directed" at plaintiff, whom defendant knew to reside in

Massachusetts. *Id.* at 470. The court emphasized that "[t]here is no issue of parties being haled into the courts of a given jurisdiction solely by virtue of a Web-site, without meaningful notice that such an outcome was likely." *Id.* at 463.

## C. Ninth Circuit Case Law

The Ninth Circuit is one of the few circuits which has jumped in the fray of Internet contacts and personal jurisdiction. Although the two cases decided by the Circuit are factually distinct from the one before this court, both rulings provide valuable guidance toward its resolution.

The Ninth Circuit has cited with approval the "sliding scale" approach articulated in *Zippo. Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414 (9th Cir.1997). Arizona plaintiffs ("Cybersell AZ") and Florida defendants ("Cybersell FL") both formed corporations known as "Cybersell." Cybersell AZ provided Web advertising, marketing and consulting services. Cybersell FL provided business consulting services for strategic management and marketing on the Web. As part of its marketing effort, Cybersell FL created a Web page which included the "Cybersell" logo, a local phone number and an invitation for companies to communications via electronic mail to Cybersell FL, as well as a hypertext link through which users could introduce themselves. Eventually, Cybersell AZ filed suit in the District of Arizona for trademark infringement. The district court dismissed the case for lack of personal jurisdiction. The Ninth Circuit affirmed.

In considering the purposeful availment factor, the court remarked:

> [N]o court has ever held that an Internet advertisement alone is sufficient to subject the advertiser to jurisdiction in the plaintiff's home state.... Rather, in each there has been 'something more' to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state.

*Cybersell,* 130 F.3d at 418. The court found that Cybersell FL conducted no commercial activity over the Internet in Arizona and that its Web page was "an essentially passive

home page." Further, the court noted that Cybersell had no contact with Arizona over the Internet other than messages from Cybersell AZ. "In short, Cybersell FL has done no act and has consummated no transaction, nor has it performed any act by which it purposefully availed itself of the privilege of conducting activities in Arizona, thereby invoking the benefits and protections of Arizona law." *Id.* at 419.

Recently, the Ninth Circuit reiterated its reasoning set forth in *Cybersell. Panavision International v. Toeppen,* 141 F.3d 1316 (9th Cir.1998). In *Panavision,* the defendant registered established trademark names as domain names for his Web sites, then attempted to "sell" the rights to the domain name to the holder of the trademark. 141 F.3d at 1319, 1322. The defendant argued that he had no contacts with the forum state, because he had not directed any activity toward or entered the state. The Ninth Circuit disagreed:

> Toeppen engaged in a scheme to register Panavision's trademarks as his domain names for the purpose of extorting money from Panavision. His conduct, as he knew it likely would, had the effect of injuring Panavision in California where Panavision has its principle place of business and where the movie and television industry is centered.

*Id.* at 1322. With these' principles in mind, the court turns to the facts of this case.

## IV. ANALYSIS OF DEFENDANTS' INTERNET CONTACTS

■ The court first determines where defendants' Web site corresponds on the sliding scale of interactivity. Through defendants' Web site, Web users may purchase compact discs, join a discount club and request franchising information. Affidavit of Lawrence M. Verdun, Ex. A.

Arguably, the capability of selling compact discs through the Web site could constitute "doing business" over the Internet and confer personal jurisdiction almost as a matter of course. However, the court finds such designation intended for those businesses which conduct a significant portion of their business through ongoing Internet relationships; for example, by entering "into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet" *Zippo,* 952 F.Supp. at 1124; *see also Thompson v. Handa–Lopez,* 998 F.Supp. at 744.

An example of such business is found in *CompuServe v. Patterson,* 89 F.3d 1257 (6th Cir.1996). In that case, the defendant was a subscriber of plaintiff's Internet provider services and entered into an agreement with plaintiff under which the defendant electronically transmitted 32 software files to plaintiff, a corporation located in Ohio. *Id.* at 1261. The Sixth Circuit found that the defendant "purposefully availed" himself of the privilege of doing business in Ohio by purposefully contracting with the plaintiff and utilizing the ·plaintiff's-services to market his products. *Id.* at 1264.

Here, defendants have done nothing more than publish an interactive Web site. Defendants have not purposefully entered into contracts with Oregon residents through the Internet, other than Ms. Lufkin, nor have defendants otherwise exchanged files electronically with forum residents so as to create "repeated" or "ongoing obligations." *See Burger King,* 471 U.S. at 473, 105 S.Ct. 2174 (defendants who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to jurisdiction). Accordingly, defendants do not "conduct business" in Oregon over the Internet so as to fall under the first category in *Zippo.*

Neither is defendants' Web site at the other end of the spectrum, passively providing information for those interested. Rather, an exchange of information can occur between defendants and users. Thus, defendants' Web site falls into the middle category, requiring further inquiry into the "level of interactivity and commercial nature of the exchange of information" to determine whether jurisdiction should be exercised. *Zippo,* 952 F.Supp. at 1124.

Plaintiff contends that the nature of defendants' Web site confers jurisdiction; the crux of plaintiff's argument is that. defendants' Web site solicits potential Oregon consumers

and therefore establishes purposeful availment of this forum. Thus, plaintiff urges the court to adopt the broad view of personal jurisdiction set forth in *Inset* and *Maritz* with respect to Internet Web sites. The court declines to do so.

On its face, the site would appear to suffice for personal jurisdiction under the middle category in *Zippo;* the level of potential interactivity, while not necessarily high, is not insubstantial. Further, the potential exchange of information can be commercial in nature. However, the court finds that the middle interactive category of Internet contacts as described in *Zippo* needs further refinement to include the fundamental requirement of personal jurisdiction: "deliberate action" within the forum state in the form of transactions between the defendant and residents of the forum or conduct of the defendant purposefully directed at residents of the forum state. *See Calder,* 465 U.S. at 788–90, 104 S.Ct. 1482; *Ballard,* 65 F.3d at 1498. This, in the court's view, is the "something more" that the Ninth Circuit intended in *Cybersell* and *Panavision.*

Although *Cybersell* involved an "essentially" passive home page, the court's reasoning easily applies in this case. In declining to assert jurisdiction, the court noted:

> Cybersell FL did nothing to encourage people in Arizona to access its site, and there is no evidence that any part of its business (let alone a continuous part of its business) was sought or achieved in Arizona.... It entered into no contracts in Arizona, made no sales in Arizona, received no telephone calls from Arizona, earned no income from Arizona, and sent no messages over the Internet to Arizona.

*Cybersell,* 130 F.3d at 419. Although the court noted the lack of commercial activity associated with the defendant's web site, the court concluded: "In short, Cybersell FL has done no act and has consummated no transaction, nor has it performed any act by which it purposefully availed itself of the privilege of conducting activities in Arizona, thereby invoking the benefits and protections of Arizona law." *Id.* In other words, "simply registering someone else's trademark as a domain name and posting a web site on the Internet is not sufficient to subject a party domiciled in one state to jurisdiction in another." *Panavision,* 141 F.3d at 1322.

Here, defendants have "consummated no transaction" and have made no "deliberate and repeated" contacts with Oregon through their Web site. *CompuServe v. Patterson,* 89 F.3d at 1265. Defendants maintain a Web site which allows users to purchase products, thus rendering it *foreseeable* that residents of Oregon, or any other state or country for that matter, could purchase a product from defendants. However, it is well-established that foreseeability alone cannot serve as the constitutional benchmark for personal jurisdiction. "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum state. Rather, it is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Defendants' Internet Web site, interactive though it may be, is not "conduct and connection" with Oregon giving defendants "fair warning" so that they would reasonably anticipate being "haled" into court here. Defendants have not taken action creating "a substantial connection" with Oregon, or deliberately engaged in "significant activities" within Oregon, or created "ongoing obligations" with residents of Oregon in a manner related to plaintiff's claims. *See Burger King,* 471 U.S. at 473, 475–76, 105 S.Ct. 2174. Rather, defendants have published information on an Internet Web site that is accessible to whomever may find it. *See Bensusan,* 937 F.Supp. at 301. The fact that someone who accesses defendants' Web site can purchase a compact disc does not render defendants' actions "purposefully directed" at this forum. *Id; see also Edberg,* 17 F.Supp.2d at 133–14; *Park Inns,* 5 F.Supp.2d at 763 (interpreting and applying *Cybersell* ); *E–Data,* 989 F.Supp. at 177. It is the conduct of the defendants, rather than the medium utilized by them, to which the parameters of specific jurisdiction apply. *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559.

Furthermore, plaintiff offers no evidence that defendants targeted Oregon residents with the intent or knowledge that plaintiff could be harmed through their Web site. The Ninth Circuit rejected this notion with respect to the "effects test" in *Cybersell*, a case involving alleged trademark infringement. The Arizona plaintiff had argued that the effects of the defendants' infringing Internet caused injury in Arizona. The Ninth Circuit disagreed: "Cybersell FL's web page simply was not aimed intentionally at Arizona knowing that harm was likely to be caused there to Cybersell AZ." *Cybersell*, 130 F.3d at 420; *see also Panavision v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir.1998) (comparing harm caused by intentional tortious conduct directed at forum to the harm alleged in *Indianapolis Colts* ); *Maritz, Inc. v. Cybergold, Inc.*, 947 F.Supp. 1328, 1331 (E.D.Mo. 1996) (alleged economic harm in forum state insufficient to establish minimum contacts absent additional conduct). Likewise, plaintiff makes no showing that defendants' Web page was "aimed intentionally" at Oregon.

A review of defendants' Web site furthers the conclusion that defendants did not intentionally or purposefully target its activities at Oregon. The site proclaims "Come Visit Us!" and provides a map of the location of defendants' stores. The maps are local in nature, providing little more than a showing of the cross-streets surrounding the stores. Nothing published on the Web site suggests that defendants intended to target Oregon residents, some 3,000 miles away, any more than they intended to target residents of other states. Rather, from defendants' invitation to visit their retail outlets, one could reasonably infer that defendants intended to target residents in their area. In sum, the court finds that this, too, is a case where "something more" is required. *Cybersell*, 130 F.3d at 418.

The court recognizes that its reasoning is at odds with some cases addressing this new issue. Not surprisingly, plaintiff relies on *Inset* and *Maritz* for the proposition that

jurisdiction over the operator of a Web site is proper if the site is interactive, i.e., capable of exchanging information with the computer user. However, the court finds lacking in *Inset* and *Maritz* the principle that a defendant must "purposefully direct" its activities at or take "deliberate action" in or create "substantial connection" with the forum state so as to provide "fair warning" that such activities may subject defendant to jurisdiction in a distant forum. *See Burger King*, 471 U.S. at 472, 105 S.Ct. 2174.

The existence of a Web site, whether passive or interactive, does not rise to the requisite level of conduct. Publishing a Web site requires no "deliberate" action within the forum state. Furthermore, a Web site is not automatically projected to a user's computer without invitation as are advertisements in a newspaper or on the television and radio. Rather, the user must take affirmative action to access either a passive or interactive Web Site. The user must turn on a computer, access the Internet and the Web, and browse the Web for a particular site. Thus, contrary to the scenario described in *Inset*, information published on Web sites is not thrust upon users indiscriminately.

Likewise, the court declines to adopt the reasoning in cases like *Hasbro v. Clue Computing*, where contacts unrelated to the plaintiff's claim are considered in conjunction with a Web site in order to assert specific jurisdiction. *Hasbro*, 994 F.Supp. at 45. Specific jurisdiction is not proper unless the forum-related contacts give rise or relate to the plaintiff's cause of action. *Ballard*, 65 F.3d at 1498. Accordingly, the court does not consider defendants' purchases from Allegro in conjunction with their Internet site for purposes of personal jurisdiction analysis. Those purchases do not give rise or relate to plaintiff's claims of trademark infringement and unfair competition.[5]

Rather, the court views the better approach as that taken by the courts which refused to assert jurisdiction on the sole

---

5. The court is not convinced that plaintiff's claims arise from or relate to defendants' Internet Web site. It seems to the court that plaintiff's claims for trademark infringement and unfair competition do not depend on defendants'

Web site. *See CD Solutions v. Tooker*, 965 F.Supp. 17 (N.D.Tex.1997). However, the court need not reach this question because it finds that defendants' Web site does not constitute purposeful availment of this forum.

basis of an interactive Web site, *see E–Data,* 989 F.Supp. at 177, and finds most persua-sive the reasoning of those which required contacts with forum residents relating to the plaintiff's claim. *See Park Inns,* 5 F.Supp.2d at 764–65; *American Network,* 975 F.Supp. at 498–99; *Digital Equipment,* 960 F.Supp. at 468–69. The court also agrees with the reasoning of those courts which have assert-ed jurisdiction on the basis that the defen-dant's Internet conduct was intended to reach residents of the forum. *See Panavi-sion,* 141 F.3d at 1322; *Vitullo,* 1998 WL 246152 at *6–7 (Web site targeted at local residents); *cf. Scherr,* 1998 WL 299678 at *5 (declining to assert jurisdiction because Web site not targeted at forum residents).

Absent actual exchanges or transactions with residents of the forum or evidence that local residents were targeted, the distinctions between specific and general jurisdiction be-come blurred. As the courts in *Inset* and *Maritz* point out, Web sites are accessible day and night to all who possess the neces-sary technological know-how and equipment. Thus, if an interactive Web site can consti-tute "purposeful availment" of a forum sim-ply by being continuously accessible to resi-dents of that forum, surely that contact can be considered "continuous and systematic" for purposes of general jurisdiction. Taking this reasoning to its logical conclusion, a plaintiff could sue a foreign defendant in any forum and claim jurisdiction based on the defendant's interactive Web site, even if the cause of action is unrelated to the Web site. Such results hardly conform with notions of "fair play and substantial justice." *Interna-tional Shoe,* 326 U.S. at 320, 66 S.Ct. 154. The grasp of personal jurisdiction was never intended to reach so far and so wide.

Moreover, the imposition of broad territo-rial concepts of personal jurisdiction on the commercial uses of the Internet has dramatic implications, "opening the Web user up to inconsistent regulations throughout fifty states, indeed, throughout the globe." *Digi-tal Equipment,* 960 F.Supp. at 463 (internal quotation marks and citations omitted); *see also Hearst,* 1997 WL 97097 at *20. The possibility of such overreaching jurisdiction raises the specter of "dramatically chilling

what may well be the most participatory marketplace of mass speech that this coun-try—and indeed the world—has yet seen." *Id.* Businesses offering products through the Internet, particularly small businesses, might forego this efficient and accessible avenue of commerce if faced with the "litigious night-mare of being subject to suit" in every juris-diction in this country. *See* Donnie L. Kidd, Jr., *Casting the Net: Another Confusing Analysis of Personal Jurisdiction and Inter-net Contacts in Telco Communications v. An Apple a Day,* 32 U. Rich. L.Rev. 505, 541 (1998).

For all of these reasons, this court will not abandon the basic principle that defendants must have taken some action to direct their activities in the forum so as to "purposely avail" themselves of the privilege of doing business within Oregon. The timeless and fundamental bedrock of personal jurisdiction assures us all that a defendant will not be "haled" into a court of a foreign jurisdiction based on nothing more than the foreseeabil-ity or potentiality of commercial activity with the forum state. *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559. Until transac-tions with Oregon residents are consummat-ed through defendants' Web site, defendants cannot reasonably anticipate that they will be brought before this court, simply because they advertise their products through a glob-al medium which provides the capability of engaging in commercial transactions. It is therefore "presumptively ... unreasonable to require [them] to submit to the burdens of litigations" in this forum. *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174.

### CONCLUSION

Due process requires that personal juris-diction be based first and foremost on fair-ness. If defendants do not have "fair warning" that their Internet activities would render them subject to jurisdiction in this forum, personal jurisdiction may not be had, regardless of other considerations:

Even if the defendant would suffer mini-mal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the contro-

versy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.

*World–Wide Volkswagen Corp.*, 444 U.S. at 294, 100 S.Ct. 559.

Plaintiff fails to show that defendants have sufficient minimum contacts with this forum to allow the exercise of personal jurisdiction in accordance with federal due process. Therefore, defendants' Motion to Dismiss (doc. 21) is GRANTED and all pending motions are DENIED as moot. Plaintiff's Complaint is HEREBY DISMISSED.

IT IS SO ORDERED.